UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

PHYLLIS M. JONES )
)
V. ) NO. 2:15-CV-32
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's application for disability insurance benefits under the Social Security Act was administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. Plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 19], while Defendant Commissioner has filed a Motion for Summary Judgment [Doc. 21].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff, who was born January 6, 1952, was 59 years old on her alleged disability onset date of October 20, 2011. She is presently 63 years of age. She has past relevant work experience as an office manager in a dental office. The job is considered sedentary as generally performed but as she described her job, she sometimes had to lift up to 20 pounds, which would place it in the light category exertionally. The ALJ ultimately found that she could perform her past relevant work.

Plaintiff's medical records are adequately summarized in the Commissioner's brief as follows:

> In January 2008, Plaintiff saw her regular physician, Susanne Toyne, M.D., for a threemonth follow-up and medication refills (Tr. 265). Upon examination, Plaintiff had right thumb/wrist joint tenderness and right mild tenderness of the lateral epicondyle insertion (Tr. 265). Dr. Toyne assessed primarily localized osteoarthritis of hand; osteoarthritis of the neck, stable; and low back pain (Tr. 265).
> In April 2008, Plaintiff told Dr. Toyne that she was having neck pain and stiffness, pain in her right arm from her elbow to her thumb, and right great toe pain (Tr. 277). She had experienced her neck pain for a long time, at least since June 2003 (Tr. 287). Upon physical examination, she had right thumb/wrist joint tenderness and right mild tenderness of the lateral epicondyle insertion (Tr. 278). Her right great toe was tender (Tr. 278). Dr. Toyne administered a pain injection into Plaintiff's right great toe, and Plaintiff complained that the needle still felt like it was in there even after removed (Tr. 278). X-rays of her right toe showed

advanced osteoarthritis of the first metatarsophalangeal joint (Tr. 259). She increased Plaintiff's Celebrex from 100 mg to 200 mg (Tr. 277).

A magnetic resonance imaging (MRI) scan of Plaintiff's cervical spine performed in August 2008, revealed mild degenerative disc disease and mild osteoarthritis involving the facet joints (Tr. 260). There was no significant disc protrusion or extrusion and there was no significant spinal stenosis or neuroforminal narrowing (Tr. 260). Dr. Toyne continued to treat Plaintiff for her reported neck pain and right big toe pain (Tr. 270, 281-86).

After Dr. Toyne left the practice, Plaintiff began seeing Diana Nunley, M.D., in January 2009 (Tr. 202). Plaintiff reported that she had no immediate medical problems, but wanted to reestablish care (Tr. 202). She reported that she had underlying osteoarthritis primarily of her great toe of her left foot as well as cervical osteoarthritis (Tr. 202). She reported that she took Celebrex 200 mg per day (Tr. 202). Dr. Nunley assessed underlying osteoarthritis of the right great toe and cervical and lumbar spines (Tr. 202).

In May 2009, William Bell, III, M.D., upon referral from Dr. Toyne before she left the practice, evaluated Plaintiff's complaints of joint and muscle pain and stiffness (Tr. 246-27). Plaintiff reported that her articular problems dated back to 1997, when she ruptured a disc in her back (Tr. 246). Upon examination, Plaintiff's neurologic examination was normal with negative Tinel's and straight leg raising signs (Tr. 247). She had no fasciculation or atrophy (Tr. 247). She had good mobility in her neck and from the standing position with the knees locked she could touch her fingers to the toes (Tr. 247). Her shoulders had normal internal and external rotation, forward flexion and posterior crossover maneuvers (Tr. 247). Her elbows had free range of motion unaccompanied by nodulosis or crepitus (Tr. 247). She had no squeeze tenderness or soft tissue enlargement and mobility was normal (Tr. 247). She had a mild bony enlargement and abduction deformity in her right hand and the flexion on her thumb was slightly limited (Tr. 247-48). In her left hand, there was a mid bony enlargement and adduction deformity at her first carpometacarpal joint (Tr. 247-48). She had normal rotation and range of motion in her hips and knees (Tr. 248). In her feet and ankles there was moderate bony enlargement at her first metatarsophalangeal joint and mild pain on compression (Tr. 248). Dr. Bell assessed osteoarthritis of the hands and feet, with limited footwear for the feet (Tr. 248). He also assessed degenerative disc disease of the cervical and lumbar spines (Tr. 248). He recommended a thumb splint to wear at night on her right hand and Voltaren gel for her hands and feet (Tr. 248). He also recommended continuation of Celebrex (Tr. 248).

In June 2009, Plaintiff told Dr. Nunley that she took Celebrex daily for her arthritis and used Voltaren gel and Duragesic at times for pain control (Tr. 193). She had fairly good range of motion upon physical examination (Tr. 193). In September 2009, Plaintiff reported that she generally had her arthritis controlled at a reasonable level, although she did have some increasing aches and pains after she did certain activities such as yard work (Tr. 189). Her physical examination

3

was unremarkable (Tr. 189). Her neck was supple and she had a good range of motion (Tr. 189). In November 2009, Plaintiff told Dr. Nunley that she was having pain along her right upper quadrant (Tr. 184). X-rays of Plaintiff's thoracic spine revealed mild degenerative changes and minimal scoliosis (Tr. 230). In December 2009, Plaintiff had questions about whether there were other medications she could take for her arthritis (Tr. 180). She had been taking Celebrex for several years, and Dr. Nunley confirmed that this was the best option (Tr. 180). Her physical examination was unremarkable (Tr. 180). Dr. Nunley diagnosed chronic musculoskeletal pain with underlying arthritis and prescribed Cymbalta to help her sleep (Tr. 180). In February 2010, Plaintiff told Dr. Nunley that she was sleeping better and having less anxiety (Tr. 339). She had time off of work that she was spending with her grandchildren and was taking Celebrex periodically (Tr. 339). Dr. Nunley assessed chronic musculoskeletal pain, underlying arthritis, and continued her medications (Tr. 339).

 At her next appointment in June 2010, Plaintiff reported to Dr. Nunley that she was doing reasonably well, with some increasing muscle cramps in her lower extremities due to stopping her statin therapy (Tr. 337). Her physical examination was unremarkable (Tr. 337). Dr. Nunley assessed chronic musculoskeletal pain most likely secondary to uncorrected sleep disorder and underlying osteoarthritis, and continued Plaintiff's medications (Tr. 337).

 In September 2010, Plaintiff told Dr. Nunley that she still had some pain in her lower extremity while she was sleeping, but was much better and was not having as much pain when she went to the store to try to shop or when she was out on her feet during the day at work (Tr. 335). Dr. Nunley continued her assessment of Plaintiff's conditions and her recommended treatment (Tr. 335). Plaintiff reported doing much better in December 2010, with no further problems (Tr. 328). She was doing fairly well with her arthritic pains and was doing better with her sleep (Tr. 328). Dr. Nunley assessed chronic musculoskeletal pain with lower extremity dysesthesia, noting that it improved with Neurontin at bedtime (Tr. 328).

 Plaintiff reported worsening osteoarthritis symptoms in February 2011 (Tr. 325). She had some tenderness over the palm at the base of her fifth finger of her hand, which Dr. Nunley felt was related to the use of her mouse and gripping it chronically (Tr. 325). Her impressions included diffuse musculoskeletal and joint pain, trigger finger deformities, and medial collateral ligament strain of the knee (Tr. 325). She ordered laboratory testing to evaluate Plaintiff's rheumatoid factor and C-reactive protein (Tr. 325). She recommended treatment of heat, gentle range of motion, and Thera-Gesic pain relieving cream to the area (Tr. 325). If Plaintiff's hand pain was not improved with wearing a splint during times of physical activity, Dr. Nunley stated she would consider a steroid injection to the tendons of the hand (Tr. 325).

 In April 2011, Plaintiff complained to Dr. Nunley of continued problems with her right hand (Tr. 319). She reported that she had been wearing a wrist splint that had helped with some of the pain, but that the activities she was doing

4

at work seemed to be aggravating it tremendously (Tr. 319). After a physical examination, Dr. Nunley assessed inflammatory changes of the right wrist, rule out occult inflammatory arthritis, trigger finger deformities on the right hand, and bilateral knee pain (Tr. 318-20). She administered a Kenalog injection and continued Celebrex 200 mg (Tr. 318-20).

At her routine follow-up in July 2011, Plaintiff reported chronic pain, but could perform her activities of daily living without limitation, could perform housework without limitation, and could work with limitation (Tr. 309-10). She exercised regularly (Tr. 309). Her physical examination was normal (Tr. 311-12).

In November 2011, Plaintiff returned to Dr. Nunley for a routine follow-up of her hyperlipidemia, hypertension, insomnia/anxiety, and medication management (Tr. 304-08). There was no specific discussion of complaints related to pain or her osteoarthritis (Tr. 304-08). Dr. Nunley's treatment note reflected that Plaintiff was working full-time (Tr. 305), but Plaintiff reported that she had recently lost her job and asked whether or not she should apply for disability due to her underlying arthritic symptoms (Tr. 308). Dr. Nunley told her she may wish to be evaluated by a rheumatologist to see if there was any further treatment for arthritis that would help her to be more functional (Tr. 308). She was taking Celebrex 200 mg (Tr. 306).

In December 2011, Plaintiff complained of increasing back pain, but stated that steroid injections had helped her and markedly reduced her pain in the past, and the doctor administered a Kenalog injection (Tr. 303). Two weeks later, Plaintiff reported an acute exacerbation of her back pain (Tr. 299). She stated her pain progressed as the day went on and was mainly in her neck and mid and lower back (Tr. 299). She also reported some stiffness in her hand joints (Tr. 299). Physical examination revealed that Plaintiff had normal gait, station, range of motion, and muscle strength and tone (Tr. 302). She had some tenderness along the spine in her cervical and thoracic region, but her range of motion was within normal limits (Tr. 302). Dr. Nunley assessed generalized osteoarthritis of multiple sites (Tr. 302).

Upon physical examination of Plaintiff in January 2012, Dr. Nunley noted that the inspection/palpation of joints, bones, and muscles was abnormal, but Plaintiff's physical examination was otherwise unremarkable (Tr. 296-97). Dr. Nunley discussed that Plaintiff's present improvement in arthritic symptoms was related to the use of Celebrex regularly to help with inflammation and her recent steroid injection (Tr. 297). Plaintiff reported feeling better and having more ability to function at home (Tr. 297). Dr. Nunley cautioned Plaintiff about excessive activities, which could exacerbate her arthritic symptoms (Tr. 297). She also discussed dietary changes, regular walking for exercise, and avoidance of weight gain to help with arthritic symptoms (Tr. 297). Dr. Nunley's assessed chronic pain, and generalized osteoarthritis of multiple sites (Tr. 297).

In May 2012, Kenton Goh, M.D., performed a consultative physical examination of Plaintiff (Tr. 354-58). Upon physical examination, she was pleasant, alert, and cooperative and seemed to give good effort (Tr. 356). Her

5

extremities were without cyanosis, clubbing, or edema (Tr. 356). She had normal pulses (Tr. 356). There was prominence of the dorsum of the left foot, but it was not tender and there was no erythema or swelling in that area (Tr. 356). There was also small area of swelling on the right hand between the second and third metacarpophalangeal joints, but the area was not particularly tender and there was no erythema (Tr. 356). Her neurological examination was normal (Tr. 356). Grip strength was 4-5+/5 on the right and 5+/5 on the left (Tr. 356). Her upper extremity flexion and extension were 5+/5 bilaterally (Tr. 356). Sensation was grossly intact (Tr. 356). Deep tendon reflexes were trace in the bilateral biceps, triceps, and brachioradialis; 2+/4 in the bilateral patella, and trace in the bilateral Achilles (Tr. 356). Plaintiff's gait was even-paced with good balance (Tr. 356). She could tandem walk, heel walk, and toe walk with good balance and speed (Tr. 357). She complained that the toe walk was uncomfortable (Tr. 357). She stood upright on both legs with equal distribution of weight (Tr. 357). She could was able to stand on her right leg alone and her left leg alone with good balance for five seconds each (Tr. 357). She was able to do a full squat, hold that position for five seconds, and raise herself back up without difficulty (Tr. 357). Neck flexion was normal, extension was 30 degrees, lateral flexion to the right and left was 30 degrees each, and rotation to the right and left was 70 degrees each (Tr. 357). Thoracolumbar flexion was normal, extension was 15 degrees, and lateral flexion to the right and left was 20 degrees each (Tr. 357). Straight leg raising test on the right caused pain in the posterior distal thigh and a pulling behind the knee at about 70 degrees and the same symptoms on the left at about 60 degrees (Tr. 357). Her shoulder, elbow, wrist, knee, and ankle ranges of motion were within normal limits bilaterally (Tr. 357). Hip flexion, extension, abduction, adduction, and external rotation were with normal limits bilaterally (Tr. 357). Internal rotation on the right was normal and on the left was 35 degrees (Tr. 357). Dr. Goh diagnosed arthritis and joint pain; low back pain, degenerative disc disease, and bone spurs; hypertension; coronary artery disease; gastrointestinal problems; fatigue and insomnia; and neck and upper back pain (Tr. 357). He expected that Plaintiff could sit for seven to eight hours in an eight-hour day, stand and walk for six hours in an eight-hour day (Tr. 357-58). He expected that she could lift and carry 10 pounds frequently and up to 20 pounds occasionally (Tr. 358).

The next month, the State agency medical consultant (Nathanial Briggs, M.D.) opined that Plaintiff could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds and could sit, stand, or walk (with normal breaks) for about 6 hours during an 8-hour workday (Tr. 364). He opined that Plaintiff could frequently climb, balance, stoop, kneel, crouch, or crawl (Tr. 365). She had no other limitations (Tr. 366-67). He stated that Dr. Goh's opinion was somewhat overly restrictive, given the essentially normal physical examination findings (Tr. 370). He evaluated the medical evidence of record and noted that Plaintiff's complaints of osteoarthritis had been responsive to treatment and that Plaintiff had no limitations as per the office visit of January 2012 (Tr. 370).

Dr. Nunley evaluated Plaintiff in May 2012 (Tr. 377-81). Plaintiff

reported arthralgias with limb pain and joint stiffness (Tr. 377). Her current pain level was 0/10, her average pain level was 0/10, and her maximum pain level was 5/10 (Tr. 377). She denied medication side effects (Tr. 377). She reported doing well with her goals and had fair symptoms control (Tr. 377). She could perform her activities of daily living without limitation and could work and do housework with limitations (Tr. 377). Her neck, pulmonary, cardiovascular, and abdomen examinations were normal (Tr. 380). On musculoskeletal examination, gait and station were normal (Tr. 380). Digits and nails were normal (Tr. 380). Inspection and palpation of joints, bones, and muscles was abnormal (Tr. 380). Range of motion was normal (Tr. 380). Dr. Nunley stated Plaintiff appeared to be having fewer problems with her neck and upper back pain since she stopped work and was no longer spending a fair amount of time on the computer (Tr. 381). She noted that Plaintiff was able to pace herself during her work hours at home and was able to rest when necessary (Tr. 381).

Plaintiff returned in June 2012 for an acute exacerbation of pain and osteoarthritis (Tr. 372-76). She reported her osteoarthritis had been worse since the last visit including worsened knee pain and joint swelling and stiffness (Tr. 372). She was able to do housework with limitations and was able to work with limitations (Tr. 372). She could perform her activities of daily living without limitations (Tr. 372). She reported doing well with her osteoarthritis goals (Tr. 372). On physical examination, inspection/palpation of joints, bones, and muscles was abnormal as well as palpation of back (Tr. 375). Dr. Nunley assessed generalized osteoarthritis of multiple sites, hypertension, and chronic pain (Tr. 375-76). Plaintiff reported she was seeking employment with Food City and a dentist in Bristol, but after some training on the job, she was having increasing pain (Tr. 376). Her last injection had been six months earlier in December 2011 (Tr. 376). Dr. Nunley administered a Kenalog intramuscular injection to help with osteoarthritic pain and encouraged Plaintiff to remain as active as possible (Tr. 376).

In August 2012, Saul Juliao, M.D., a State agency medical consultant, stated that the additional medical evidence of record did not further reduce the RFC assessed in June 2012 (Tr. 384). He stated he had reviewed all of the evidence in the file and affirmed the June 2012 opinion as written (Tr. 384).

In October 2012, Plaintiff obtained services from Friends In Need Health Center for medication management (Tr. 392). She reported in November 2012 that her fibromyalgia was "acting up" (Tr. 393). She was given medication refills (Tr. 393). When her medications were refilled in January 2013, she reported she was stable (Tr. 394). In March 2013, she was treated for an upper respiratory infection (Tr. 395). She complained of left shoulder pain in April 2013, which the provider attributed to muscle strain due to increased activity (moving houses) (Tr. 396). Examination of her shoulder revealed no crepitus, swelling, or hotness (Tr. 396). Her left arm sensibility was intact (Tr. 396). Her medications were continued and she was given massage therapy and possible acupuncture (Tr. 396). She returned in April 2013 with pain on the left side of her upper back (between

her shoulders and neck) and along the spine for over a week (Tr. 397). She reported that her pain level was 3 on a 10-point pain scale before work and 10 after work (Tr. 397). Examination revealed tense sore muscles of the left trapezius and good range of motion of the neck (Tr. 397). She reported feeling relaxed with no pain after treatment (Tr. 397). She was assessed with neck pain due to strain and chronic insomnia (Tr. 397). She was given stretch exercises and advised to return in two weeks (Tr. 397). A week later, Plaintiff reported that acupuncture helped at the time, but she started hurting again at work, plus her recent move did not help (Tr. 398). The provider administered a Kenalog injection in the left hip for arthritis pain (Tr. 398). Her medications were refilled in May and June 2013 (Tr. 398).

[Doc. 22, pgs. 3-12].

On August 29, 2013, the ALJ conducted his administrative hearing. At the hearing, he took the testimony of Bentley Hankins, a vocational expert ["VE"]. He asked the VE to characterize the Plaintiff's past relevant work, which Plaintiff described as an office manager in a dental office. Mr. Hankins stated that her duties were consistent with the jobs in the national economy of doctor's office receptionist, which is sedentary, and administrative clerk, which is light work. He said "though the claimant did perform the work at a sedentary level, in terms of sitting, and standing, and walking, she reported that she sometimes had to lift about 20 pounds, for example, in filing, which is consistent with light exertion." (Tr. 45).

He then asked whether Plaintiff could perform her past relevant work if she was capable of light exertion, but limited in standing or walking to three total hours out of an eight hour workday. Mr. Hankins stated that with that residual functional capacity ["RFC"], Plaintiff could do her past relevant work as she actually performed it and as generally performed in the national economy as the job of receptionist or administrative

8

clerk.  If limited to sedentary work, she could only perform the receptionist job as generally performed, and not her prior job as she described it or the light job of administrative clerk.  (Tr. 45-47).

Mr. Hankins was then asked by Plaintiff's attorney if she could perform any of those jobs "if she didn't have repetitive use of her right wrist, and right elbow"  (Tr. 47).  Mr. Hankins replied that she could not perform the jobs if she was incapable of "frequent" use of her hands.  He defined "frequent" as being one third of a day to thirds of the day.  (Tr. 47).

Before proceeding to the discussion of the ALJ's hearing decision, the Court notes that the ALJ found that the Plaintiff was, at all relevant times, a person of advanced age (Tr. 45).  He ultimately found that Plaintiff could return to her past relevant work as she performed it and as it is generally performed throughout the national economy.  At Step Four of the sequential evaluation process, the Commissioner determines if a claimant with a specific RFC can perform their past relevant work.  20 C.F.R. § 404.1520(f).  If a claimant cannot perform their past relevant work, the process continues to Step Five, where the Commissioner determines if the claimant, given his or her age, education, past work experience and RFC, can make an adjustment to other work.  If a person can do an essentially full range of work at a particular exertional level, the Medical-Vocational Guidelines at 20 C.F.R. Ch. III, Pt. 404, Subpt. P. App. 2 [the "Grid"] may be used to determine whether the individual is disabled or not.  If the Grid cannot be used because a person can do less than a full range of work at a particular exertional level, and the person

9

would be not disabled if they could do the full range of work at that level, an ALJ often utilizes a VE to determine if a significant number of jobs nonetheless exists in the national economy which that person can perform. However, if a claimant meets all of the characteristics of a particular Grid rule, and that rule directs a finding of disability, then the person is, in fact, disabled. *See, id.* § 200.00(d)

Grid rule 202.06 states that if a person of advanced age can perform the full range of light work, has a high school education or more which does not provide for direct entry into skilled work, and has past relevant work which was skilled or semiskilled but those skills are not transferable to other jobs, the person is nevertheless disabled. It thus appears that if the Defendant cannot return to her past relevant work at Step Four, she would then be disabled under the regulations at Step Five.

On September 16, 2013, the ALJ issued his hearing decision. He found that the Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 20, 2011. He found that she had severe impairments of osteoarthritis and degenerative disc disease (Tr. 11). He then discussed in detail the medical evidence set forth above (Tr. 11-16). In the course of doing so, he discussed and considered the effects of other physical problems alleged by Plaintiff, including heart disease, gastrointestinal impairments, and sinus problems.

He discussed Plaintiff's subjective complaints in depth. He noted that in a function report dated March 19, 2012, Plaintiff asserted that she could not lift over 10 pounds and had various postural limitations. She also complained of trouble standing,

10

Case 2:15-cv-00032-JRG-MCLC   Document 23   Filed 01/11/16   Page 10 of 15   PageID #: 527

walking and sitting because of pain and discomfort, as well as negative side effects from some of her medications. He then discussed an April 18, 2012 fatigue questionnaire, noting her daily activities in addition to her complaints of pain (Tr. 16). In another function report from July 29, 2012, Plaintiff stated her pain was getting worse, and her standing, walking, sitting and lifting being even more limited (Tr. 16-17).

The ALJ then found that Plaintiff's alleged anxiety disorder did not cause more than a minimal limitation in her ability to perform basic work activities and was thus not severe (Tr. 17-18).

He then recounted Plaintiff's testimony at the administrative hearing, once again in great detail (Tr. 18). She described the pain she had at her previous job in the dental office, stating that she left because she was "pushed out" by members of the dentist's family over time. (Tr. 34). She described her pain and difficulties getting about in great detail. The Plaintiff has a part time job and described the pain she experiences standing or walking at work. She said she was often as tired when she rises in the morning as when she goes to bed (Tr. 18).

The ALJ stated that Plaintiff did not meet or medically equal any listed impairments in the Social Security Regulations (Tr. 18). He then proceeded to state his RFC finding, which was that the Plaintiff could perform the full range of light work reduced by a limitation in standing and walking to no more than three hours out of an eight hour workday. In arriving at this finding, he evaluated the credibility of Plaintiff's subjective complaints, finding her not completely credible (Tr. 19). In this regard he

11

gave his reasons for not finding Plaintiff's heart problems, gastrointestinal problems, sinus problems and anxiety to be severe impairments.

He then discussed her complaints of disabling pain. He noted that Plaintiff's daily activities included cooking meals, performing household chores, driving, going grocery shopping, managing finances, attending church, reading, watching television, watching grandchildren at sporting events, and caring for herself. He felt that her description of daily activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 21). He noted her medical treatment was not what one would expect for a totally disabled person. He stated that her "impairments were present at the same level of severity prior to the alleged onset date." *Id.* Since she worked with the symptoms before, he reasoned they would not prevent work now. He spoke of her part-time work she was now doing at a drug store involving five hour shifts for up to three days at a time. He noted that no restrictions had been placed upon her by treating doctors. *Id.*

He then evaluated the opinion evidence. He gave great weight to the State Agency psychological consultants, who opined Plaintiff had no severe mental impairment. He gave some weight to Dr. Goh, although the ALJ found that Plaintiff could only stand or walk for up to three hours as opposed to the six hours opined by Dr. Goh. In this same regard, he gave little weight to the State Agency medical consultants who opined Plaintiff could perform medium work. *Id.*

He then found that Plaintiff could, with the RFC he found, perform her past

12

relevant work as a dental office manager, which was consistent with the described occupations of doctor's office receptionist and administrative clerk. Accordingly he found that she was not disabled (Tr. 22).

Plaintiff asserts that the ALJ erred in his RFC finding. Specifically, she states that his finding failed to account for her lack of ability to use her hands or wrists. Second, she states that the ALJ erred in his negative assessment of her credibility.

With respect to the first assignment of error, it is as important to note what *is not* in the record as what *is* in it. It is true that she was treated for arthritis in her hands. It is true that Dr. Goh noted a slight decrease in grip strength of the right hand. However, there is no report or opinion in the record from any physician that Plaintiff's arthritis in her hands prevents her from performing the lifting, handling and fingering required to meet the exertional requirements of light work. Dr. Goh certainly felt that she could perform the requirements of light work. The disregarded State Agency physicians felt she could do medium work. None of the office notes from her treating doctors recommended limitations in this regard. The ALJ found her more limited in his RFC finding than *any* doctor did, limiting her standing and walking to three hours. The medical evidence of the diagnosed condition is present, but evidence of a greater restriction is absent from the record. Also, Plaintiff's part-time work which was going on at least through the date of the hearing decision further detracts from suggesting a limitation which would prevent light work.

Regarding the finding that Plaintiff was not completely credible, the ALJ carefully
13

analyzed the evidence and considered each and every one of Plaintiff's subjective complaints. As outlined above, he stated cogent reasons for finding Plaintiff only partially credible, including her daily activities and working part time.

The Sixth Circuit has held that the credibility findings of an ALJ are entitled to great deference, and are almost "unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013). An ALJ must make specific findings for a claimant not to be credible, but "[a]s long as the ALJ cite[s] substantial, legitimate evidence to support his factual conclusions, we [the courts] are not to second-guess." *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 713-14 (6th Cir. 2012).

In this regard, once again medical opinion evidence is lacking that she has any restrictions greater than those found by the ALJ. The particular restriction in his RFC finding of an inability to stand or walk for more than three hours was based on his finding Plaintiff credible to that extent. The Court simply cannot say that the ALJ lacked evidence to support his credibility finding, or that he failed to cite substantial evidence to support his findings.

The factor that makes this case troublesome is Plaintiff's age coupled with her disability status if she could not return to her past relevant work. It would be easy to speculate that the Step Four finding was a "ruse" to avoid the impact of the Grid at Step Five. However, there is nothing in the transcript or the hearing decision that even hints at this being the case, and Plaintiff does not claim that there was. Instead, it appears that the ALJ proceeded through the required evaluation process and, Step Four was where it

ended under the facts and applicable law.

There is substantial evidence to support the ALJ's findings regarding Plaintiff's RFC and a partial lack of credibility. Also, the ALJ did not commit any errors of law in applying the Social Security Act, regulations, or case law to Plaintiff's claim. Accordingly, it is respectfully recommended that Plaintiff's Motion for Judgment on the Pleadings [Doc. 19] be DENIED, and that Defendant Commissioner's Motion for Summary Judgment [Doc. 21] be GRANTED.[1]

                                                                            Respectfully submitted,

                                                                   s/ Clifton L. Corker
                                                                  United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).